## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## NORTHERN DIVISION

JAMES R. MCCLELLAN, JR.

        *Plaintiff*,

  *v.*

COMMISSIONER OF SOCIAL
SECURITY,

        *Defendant*.

_____/

CASE NO. 1:22-cv-11713

HON.  THOMAS L. LUDINGTON
DISTRICT JUDGE

HON. PATRICIA T. MORRIS
MAGISTRATE JUDGE

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON CROSS MOTIONS FOR SUMMARY JUDGMENT (ECF Nos. 16, 17)

### I.    RECOMMENDATION

Plaintiff challenges the Commissioner of Social Security regarding a final decision denying his claim for Disability Insurance Benefits ("DIB") under the Social Security Act.  The case was referred to the undersigned for review.  (ECF No. 2); *see* 28 U.S.C. § 636(b)(1)(B) (2012); E.D. Mich. LR 72.1(b)(3).  For the reasons below, I recommend that the Court **GRANT** Plaintiff's motion for summary judgment (ECF No. 16), that the case be remanded under sentence four of Section 405(g), and that the Commissioner's motion (ECF No. 17) be **DENIED**.

## II.   REPORT

### A. Introduction and Procedural History

On December 14, 2020, Plaintiff applied for DIB, alleging disability as of June 1, 2018.  (ECF No. 10-2, PageID.41) (ECF No. 10-5, PageID.379).  His application for benefits claims disability due to a head injury, Chronic Obstructive Pulmonary Disorder ("COPD"), arthritis of the knee, bipolar disorder, Post Traumatic Stress Disorder ("PTSD"), migraine headaches, and cervical and lumbar degenerative disc disease.  (ECF No. 10-6, PageID.424).

Following the initial denial of the claim on May 20, 2021, Plaintiff requested a hearing, held March 18, 2022 before Administrative Law Judge ("ALJ") Adam Dale (ECF No 10-2, PageID.41-53).  On March 30, 2022, ALJ Dale determined that Plaintiff was not disabled.  (*Id*. at PageID.53).  On June 30, 2022, the Appeals Council denied review of the ALJ's determination.  (*Id*. at PageID.29-31).   Plaintiff filed the present action on July 26, 2022.

### B. Standard of Review

The Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g) (2018).  The District Court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record."  *Sullivan v. Comm'r of Soc. Sec.*, 595 F. App'x 502, 506 (6th Cir. 2014) (internal quotation marks

omitted).  Substantial evidence is "more than a scintilla of evidence but less than a preponderance." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted).  "[T]he threshold for such evidentiary sufficiency is not high. . . . It means - and means only - 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ.  *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989).  The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility."  *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994).  If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion."  *Id*. at 286 (internal citations omitted).

### C. Framework for Disability Determinations

Disability benefits are available only to those with a "disability." *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  "Disability" means the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected

to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months." 42 U.S.C. § 1382c(a)(3)(A) (2012). The Commissioner's regulations provide that disability is determined through the application of a five-step sequential analysis:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.
>
> (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.
>
> (iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled.
>
> (iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.
>
> (v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) (2021); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the existence and severity of

limitations caused by [his or] her impairments and the fact that [he or] she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003).  The claimant must provide evidence establishing the residual functional capacity, which "is the most [the claimant] can still do despite [his or her] limitations," and is measured using "all the relevant evidence in [the] case record."  20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1) (2021).

The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled.  *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006).  At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC and considering relevant vocational factors."  *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g) (2021)).

### D. The ALJ's Findings

Following the five-step sequential analysis, the ALJ determined that Plaintiff was not disabled.  At Step One, the ALJ found that Plaintiff had not engaged in substantial gainful activity ("SGA") since the alleged onset date of June 1, 2018 through the date last insured for DIB of December 31, 2019.

(ECF No. 10-2, PageID.43).   At Step Two, the ALJ found the following

impairments severe:

> "lumbar degenerative disc disease status/post surgery, cervical
> degenerative disc disease with cervical spine stenosis, epidural
> fibrosis, connective tissue stenosis of the lumbar spine, bilateral
> knee chondromalacia, obstructive sleep apnea, chronic
> obstructive pulmonary disease ("COPD"), migraines, history of
> traumatic brain injury, obesity, restrictive airways disorder,
> bipolar disorder, anxiety disorder, panic disorder, and
> posttraumatic stress disorder."

(*Id*. at PageID.43-44).

The ALJ determined that Plaintiff experienced "moderate"

psychological limitation in understanding remembering or applying

information; interacting with others; concentration, persistence, or pace; and

adapting and managing himself.  (*Id*. at PageID.46).  At Step Three, he found

that none of the impairments met or medically equaled a listed impairment

found in 20 C.F.R. Part 404, Subpart P, Appendix 1.   (*Id*. at PageID.44).

The ALJ found that Plaintiff had the Residual Functional Capacity

("RFC") for exertionally sedentary work with the following additional

limitations:[1]

> [H]e could frequently push or pull or operate foot controls with

---

[1] Under 20 C.F.R. §§ 404.1567(a-e), 416.967(a-e) *sedentary* work is defined as
"lifting no more than 10 pounds at a time and occasionally lifting or carrying articles
like docket files, ledgers, and small tools;" *light* work as "lifting no more than 20
pounds at a time with frequent lifting or carrying of objects weighing up to 10
pounds;" *medium* work as "lifting no more than 50 pounds at a time with frequent
lifting or carrying of objects weighing up to 25 pounds;" and
exertionally *heavy* work as "involv[ing] lifting no more than 100 pounds at a time

the left lower extremity. The claimant requires a cane to ambulate. He could not climb ladders, ropes, or scaffolds. He could occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs. He could not work around vibration, at unprotected heights, or around moving mechanical parts. He could not work around strobe lights, flashing lights, or bright lights, such as those found on a theater stage. He could occasionally work around concentrated exposure to atmospheric conditions such as fumes, noxious odors, dust, gases, or poor ventilation. The claimant could perform simple tasks, as well as make simple work-related decisions. He could not work at a production rate pace, such as assembly line work. He could adapt to occasional changes in his work routine or job tasks. He could occasionally interact with supervisors and coworkers but not with the public. He must have been allowed to wear prescription sunglasses while remaining on task.

(*Id*. at PageID.47).

At Step Four, the ALJ found that Plaintiff was unable to perform his past relevant work as a human resources sergeant-personnel manager. (*Id*. at PageID.52). At Step Five, the ALJ cited the VE's testimony in support of his determination that Plaintiff could perform a significant number of jobs in the national economy including the exertionally sedentary, unskilled work of a document preparer, printed circuit board assembler, and final assembler. (*Id.* PageID.53, 78). Accordingly, the ALJ concluded that Plaintiff was not disabled. (*Id*. at PageID.53).

### E. Administrative Record

---

with frequent lifting or carrying of objects weighing up to 50 pounds. *Very Heavy* work requires "lifting objects weighing more than 100 pounds at a time with frequent lifting or carrying of objects weighing 50 pounds or more.

### 1. The Medical Evidence[2]

October 2018 records by treating psychologist Tamsen W. LaDou, Ph.D. note that Plaintiff was "positive for severe depression and anxiety" and "struggle[d] with symptoms of paranoid ideation." (ECF No. 10-8, PageID.1461). October 2018 treating records state that Plaintiff became visibly agitated in a restaurant when the server "was slow to return with napkins. . . ." (ECF 10-7, PageID.934). November 2018 treating records note an appropriate mood and affect. (*Id*. at PageID.852). Plaintiff indicated that he was amenable to continued psychological counseling. (*Id*.) Plaintiff required assistance in planning and organizing; maintaining safety; maintaining a schedule (due to short-term memory deficiencies); and regulating his mood and behavior. (*Id*. at PageID.860-61). His wife reported that he woke up from a nightmare on one occasion with a knife in his hand, and on two other occasions turned on the gas stove while sleepwalking. (*Id*. at PageID.899). She reported that Plaintiff acted inappropriately in public and that she was required to handle the family's finances. (*Id*. at PageID.900).

December 2018 treating records note that Plaintiff was "alert, oriented, anxious, agitated, [and] forgetful." (ECF No. 10-7, PageID.797). Periodic

---

[2] Plaintiff's eligibility for DIB expired on December 31, 2019, requiring him to establish disability before that date. Subsequently created records are discussed where possibly relevant to his condition before the expiration date.

interaction with a social worker was recommended "to address psychosocial concerns . . . ." (*Id.* at PageID.799). Records from the same period note that Plaintiff was prescribed home oxygen therapy. (*Id.* at PageID.801). Plaintiff's wife reported that Plaintiff was paranoid about becoming sick and was mixing bleach with "cleaning products that shouldn't be mixed." (*Id.* at PageID.840). Records from a home visit by Dr. LaDou note that Plaintiff appeared depressed and experienced anxiety, agoraphobia, and PTSD including nightmares. (*Id.* at PageID.803). Dr. Ladou noted that Plaintiff "lost track of the conversation" and asked "'what were we talking about?'" (*Id.*) He described Plaintiff as "highly symptomatic." (*Id.* at PageID.804). Plaintiff's wife reported that Plaintiff spent impulsively and exhibited symptoms of paranoia. (*Id.*) Plaintiff was prescribed psychotropic medication for "anger, irritability, and PTSD." (*Id.* at PageID.807-08). Physical treating records from the same month note Plaintiff's report of level "seven" back and right neck pain. (*Id.* at PageID.817).

April 2019 records note that Plaintiff had recently experienced a 16-hour panic attack after two "pretty good" days. (ECF No. 10-8, PageID.1778-79). Dr. Ladou's records from the next month state that Plaintiff still believed that he was being followed and exhibited reduced short memory and difficulty articulating his physical symptoms. (*Id.* at PageID.1699).

Records from a July 2019 home visit by a social worker note Plaintiff's

9

"bland mood and affect" but that he was intermittently "manic." (ECF No. 10-8, PageID.1601).   Plaintiff's wife reported that she was attempting to be excused from jury duty so she could care for Plaintiff.  (*Id*. at PageID.1601). Plaintiff's wife was deemed an adequate caregiver.  (*Id*. at PageID.1608-09). Plaintiff required help with washing and dressing.  (*Id*. at PageID.1609).  In October 2019, Plaintiff feared a "pipe bomb" had exploded when hearing a noise outside his house.  (*Id*. at PageID.1460).

In November 2020, the Department of Veterans Affairs ("VA") found that Plaintiff was currently "totally and permanently disabled due to [his] service-connected disabilities." (ECF No. 10-5, PageID.369-371).  He was found to be 100 percent disabled due to "traumatic brain injury and posttraumatic stress disorder, major depressive disorder, panic with agoraphobia and mixed bipolar disorder" due to military service. (*Id*. at PageID.373).   The same report found that Plaintiff was also 50 percent disabled by obstructive sleep apnea with restless leg syndrome and 50 percent disabled by migraine headaches.  (*Id*. at PageID.372-373).

In February 2021, Bruce Douglass, Ph.D. performed a non-examining assessment of the treating and consultative records for the relevant period, finding no more than moderate psychological limitation.  (ECF No. 10-3, PageID.254).   In May 2021, David Kroning, M.D. performed a non-examining assessment of the records pertaining to Plaintiff's physical

condition, finding that he could lift/carry up to 20 pounds occasionally and 10 frequently; sit, stand, or walk for six hours in an eight-hour workday; and push/pull without limitation in the upper extremities. (*Id*. at PageID.265). Dr. Kroning found that Plaintiff would be required to alternate between sitting and standing ("sit/stand option") on a "periodic" basis. (*Id*.)  He limited Plaintiff to occasional postural activity. (*Id*. at PageID.265-266).  Dr. Kroning found that Plaintiff should avoid even moderate exposure to extreme cold and humidity and avoid concentrated exposure to vibration, airborne pollutants, and hazards, adding that Plaintiff should also "avoid strobe, bright lights or flashing lights." (*Id*. at PageID.266).  He found that the records for the relevant period would not change the RFC crafted by an earlier, March 28, 2018 decision by another ALJ.  (*Id*.)

The same month, Ronald Marshall, Ph.D. performed a non-examining review of the treating records, finding that Plaintiff experienced mild limitation in the ability to understand, remember, or apply information and moderate limitation in the ability to interact with others and maintain concentration, persistence, or pace.  (*Id*. at PageID.264).  He found no limitation in adapting or managing oneself.  (*Id*.).  He commented that Plaintiff would "work best alone or in small, familiar groups" but that Plaintiff's ability in self-care "was intact." (*Id*. at PageID.268).  Dr. Marshall noted that due to the lack of an independent examination between June 1, 2018

11

and December 31, 2019, Plaintiff's "true functional limitations . . . are not entirely clear." (*Id*. at PageID.263).

In September 2021, Dr. LaDou composed an opinion letter noting Plaintiff's "very complex medical and psychiatric history that demands ongoing caregiver needs 24 hours per day." (ECF No. 10-9, PageID.2949). He noted that Plaintiff's wife, a licensed practical nurse, helped him bathe, walk outside, dress, take medication, and use a CPAP machine. (*Id*.) Dr. LaDou noted that Plaintiff was "suspicious, paranoid, and distrustful of others resulting in anger outbursts when in any small gathering, crowded situation, or when riding in the car." (*Id*.) He noted further that due changes in oxygen saturation and medication, Plaintiff experienced "profound sleepiness." (*Id*.) He opined that Plaintiff was unable to live by himself. (*Id*.)

### 2. Plaintiff's Testimony

At the hearing before the ALJ, Plaintiff offered the following testimony. Before becoming disabled, he worked as a Human Resources Sergeant for the Army. (ECF No. 10-2, PageID.63). The job required him to prepare personnel reports and other human resource related tasks. (*Id*.)

Plaintiff experienced "constant" back pain radiating into his upper and lower extremities. (*Id*. at PageID.64). He experienced leg weakness and numbness causing him to drag his feet. (*Id*.) He had been prescribed a double-sided brace for walking and used a cane on a daily basis. (*Id*.) He used a

walker and an oxygen tank if traveling any distance.  (*Id.*)

Plaintiff was unable to stand for more than five minutes, sit for more than 30, or walk for more than one block due to back pain.  (*Id.*)  He was unable to lift more than 20 pounds.  (*Id.* at PageID.66).  He coped with back pain by reclining and the use of heating pads, cream, ice packs, and a TENS unit.  (*Id.*)

Migraine headaches forced Plaintiff to recline for four to five hours in a darkened room each day.  (*Id.* at PageID.67).  He was light sensitive apart from the condition of migraines.  (*Id.*)  His oxygen levels tended to drop while he was sitting.  (*Id.*). He used an oxygen machine daily.  (*Id.*)  He was unable to help his wife with light household chores for more than 10 minutes at a time.  (*Id.* at PageID.68).

Plaintiff experienced sleep disturbances most nights consisting of "military flashbacks" including violence.  (*Id.* at PageID.68-69).  He was "paranoid" and felt that he was being judged by others while out in public.  (*Id.* at PageID.69).  His driving was limited to short trips.  (*Id.* at PageID.70).  He became frustrated with other drivers even while traveling as a passenger.  (*Id.*)  He disliked going out in public and left the house only to go to doctors' appointments or at his wife's insistence.  (*Id.* at PageID.71).  He "constantly" checked to see that the doors were locked and had changed the locks on the doors of their home four times.  (*Id.* at PageID.72-73).  He spent most of his

13

waking hours watching television and playing with his dogs.   (*Id*. at PageID.72).   He experienced symptoms of depression including lack of motivation to arise and dress.   (*Id*. at PageID.73).   He needed reminders to take his medication.   (*Id*. at PageID.74).   He often became angry while watching news shows and was sometimes unable to follow the plot of scripted shows.   (*Id*. at PageID.74).   He had been hospitalized after March 2018 for sepsis.   (*Id*. at PageID.75).

### 3.  The Vocational Expert's Testimony

The VE classified Plaintiff's past relevant work as a personnel manager as sedentary and skilled.   (*Id*. at PageID.76).   The ALJ then posed the following set of modifiers to the VE, describing a hypothetical individual of Plaintiff's age, education, and work history:

> The claimant can frequently push or pull or operate foot controls with the left lower -- sorry, this hypothetical individual's limited to a restricted range of work at the sedentary exertional level. This individual can frequently push or pull or operate foot controls with the left lower extremity.  This individual requires a cane to ambulate.  This individual cannot climb ladders, ropes, or scaffolds.  This individual can occasionally balance, stoop, kneel, crouch, crawl, or climb ramps or stairs.  This individual cannot work around vibration, at unprotected heights, or around moving mechanical parts.  This individual cannot work around strobe lights, flashing lights, or bright lights, such as those found on a theater stage. This individual can occasionally work around concentrated exposure to atmosphere conditions such as fumes, noxious odors, dust, gases, or poor ventilation.  This individual can perform simple tasks, as well as make simple, work-related decisions.  This individual cannot work at a production rate pace, as in assembly line work. This individual can adapt to occasional

changes in the work routine or job tasks.  This individual can occasionally interact with supervisors and coworkers, but not the public.  This individual must be allowed to wear prescription sunglasses while remaining on task.

(*Id*. at PageID.77-78).   The VE testified that the above limitation would preclude Plaintiff's past relevant work but would allow for the unskilled, sedentary work of a document preparer, Dictionary of Occupational Titles ("DOT") code 249.587-018 (approximately 37,000 positions in the national economy); printed circuit board assembler, DOT code 726.684-110 (8,000); and final assembler, DOT code 713.687-018 (14,000).  (*Id*. at PageID.78). The VE testified that the need to be off task for more than 10 percent of the workday or more than eight unexcused absences in a 12-month period would preclude competitive employment.  (*Id*. at PageID.79). In response to questioning by Plaintiff's attorney, the VE stated that the need to be redirected every hour; need for an isolated workspace; or a 20 percent loss of productivity would also be work preclusive.  (*Id*. at PageID.80).  The VE stated that her testimony was based on the information found in the DOT, except for her testimony as to foot controls, the use of a cane, climbing, vibration, heights, strobe lights, environmental conditions, the need for redirection, and workplace interaction, which was based on her own education and experience as a vocational counselor.  (*Id*.)

**F.  Governing Law**

The ALJ must "consider all evidence" in the record when making a disability decision.  42 U.S.C. § 423(d)(5)(B) (2012).  The newly promulgated regulations, applicable to applications for disability benefits filed on or after the effect

tive date of March 27, 2017, such as Plaintiff's application here, distinguish between acceptable medical sources, medical sources, and nonmedical sources. An acceptable medical source means a medical source who is a:

(1)   Licensed physician (medical or osteopathic doctor);

(2)   Licensed Psychologist, which includes:

    (i)   A licensed or certified psychologist at the independent practice level; or

    (ii)  A licensed or certified school psychologist, or other licensed or certified individual with another title who performs the same function as a school psychologist in a school setting, for impairments of intellectual disability, learning disabilities, and borderline intellectual functioning only;

(3)   Licensed optometrist for impairments of visual disorders, or measurement of visual acuity and visual fields only, depending on the scope of practice in the State in which the optometrist practices;

(4)   Licensed podiatrist for impairments of the foot, or foot and

16

ankle only, depending on whether the State in which the podiatrist practices permits the practice of podiatry on the foot only, or on the foot and ankle;

(5)     Qualified speech-language pathologist for speech or language impairments only. For this source, qualified means that the speech-language pathologist must be licensed by the State professional licensing agency, or be fully certified by the State education agency in the State in which he or she practices, or hold a Certificate of Clinical Competence in Speech-Language pathology from the American Speech-Language-Hearing Association;

(6)     Licensed audiologist for impairments of hearing loss, auditory processing disorders, and balance disorders within the licensed scope of practice only [];

(7)     Licensed Advanced Practice Registered Nurse, or other licensed advanced practice nurse with another title, for impairments within his or her licensed scope of practice []; or

(8)     Licensed Physician Assistant for impairments within his or her licensed scope of practice [].

20 C.F.R. §§ 404.1502(a), 416.902(a). (2021).

A medical source is "an individual who is licensed as a healthcare worker by a State and working within the scope of practice permitted under State or Federal law, or an individual who is certified by a State as a speech-language pathologist or a school psychologist and acting within the scope of practice permitted under State or Federal law." *Id.* §§ 404.1502(d), 416.902(a). In contrast, a nonmedical source means "a source of evidence who is not a medical source." *Id.* §§ 404.1502(e), 416.902. "This includes, but is not limited to: (1) [the claimant]; (2) Educational personnel (for example,

17

school teachers, counselors, early intervention team members, developmental center workers, and daycare center workers); (3) Public and private social welfare agency personnel; and (4) Family members, caregivers, friends, neighbors, employers, and clergy." *Id.*

The SSA "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical findings, including those from your medical sources." *Id.* §§ 404.1520c(a), 416.920(a). "The most important factors we consider when we evaluate the persuasiveness of medical opinions and prior administrative medical findings are supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section)." *Id.* The SSA will consider several factors when it contemplates "the medical opinion(s) and prior administrative medical findings" in a case. *Id.*

Of these factors, the first is "supportability." This factor considers that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be[.]" *Id.* §§ 404.1520c(c)(1), 416.920c(c)(1).

The SSA will also consider the "consistency" of the claim. This includes the consideration that "[t]he more consistent a medical opinion(s) or

18

prior administrative medical finding(s) is with the evidence from other
medical sources and nonmedical sources in the claim, the more persuasive the
medical opinion(s) or prior administrative medical finding(s) will be[.]" *Id.*
§§ 404.1520c(c)(2), 416.920c(c)(2).

In addition, the SSA will consider the "[r]elationship with claimant[.]"
*Id*. §§ 404.1520c(c)(3), 416.920c(c)(3).  This factor will include the analysis
of:

(i)    Length of the treatment relationship. The length of time a
       medical source has treated you may help demonstrate
       whether the medical source has a longitudinal
       understanding of your impairment(s);

(ii)   Frequency of examinations. The frequency of your visits
       with the medical source may help demonstrate whether the
       medical source has a longitudinal understanding of your
       impairment(s);

(iii)  Purpose of the treatment relationship. The purpose for
       treatment you received from the medical source may help
       demonstrate the level of knowledge the medical source has
       of your impairment(s);

(iv)   Extent of the treatment relationship. The kinds and extent
       of examinations and testing the medical source has
       performed or ordered from specialists or independent
       laboratories may help demonstrate the level of knowledge
       the medical source has of your impairment(s);

(v)    Examining relationship. A medical source may have a
       better understanding of your impairment(s) if he or she
       examines you than if the medical source only reviews
       evidence in your folder[.]

*Id.* The fourth factor of the SSA's analysis is "specialization."  In making this

determination, the SSA will consider "[t]he medical opinion or prior administrative medical finding of a medical source who has received advanced education and training to become a specialist may be more persuasive about medical issues related to his or her area of specialty than the medical opinion or prior administrative medical finding of a medical source who is not a specialist in the relevant area of specialty." *Id.* §§ 404.1520c(c)(4), 416.920c(c)(4).

Finally, the SSA will consider "other factors." These may include any other factors that "tend to support or contradict a medical opinion or prior administrative medical finding." *Id.* §§ 404.1520c(c)(5), 416.920c(c)(5). "This includes, but is not limited to, evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of our disability program's policies and evidentiary requirements." *Id.* Further, when the SSA considers "a medical source's familiarity with the other evidence in a claim, we will also consider whether new evidence we receive after the medical evidence source made his or her medical opinion or prior administrative medical finding makes the medical opinion or prior administrative medical finding more or less persuasive." *Id.*

As to the duty to articulate how persuasive the medical opinions and prior administrative medical findings are considered, the new regulations provide "articulation requirements." The ALJ will consider "source-level

20

articulation."   Pursuant to this requirement, "[b]ecause many claims have voluminous case records containing many types of evidence from different sources, it is not administratively feasible for [the ALJ] to articulate in each determination or decision how [he or she] considered all of the factors for all of the medical opinions and prior administrative medical findings in [each] case record."   *Id.* §§ 404.1520c(b)(1), 416.920c(b)(1). "Instead, when a medical source provides multiple medical opinion(s) or prior administrative finding(s), [the ALJ] will articulate how [he or she] considered the medical opinions or prior administrative findings from that medical source together in a single analysis using the factors listed in paragraphs (c)(1) through (c)(5) of [these sections], as appropriate."   *Id.*  The regulations reiterate that the ALJ is "not required to articulate how [he or she] considered each medical opinion or prior administrative finding from one medical source individually."   *Id.*

The regulations stress that the "factors of supportability (paragraph (c)(1) of these sections) and consistency (paragraph (c)(2) of these sections) are the most important factors we consider when we determine how persuasive we find a medical source's medical opinions or prior administrative medical findings to be."   *Id.* §§ 404.1520c(b)(2), 416.920c(b)(2).  As such, the SSA "will explain how we considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in your determination or decision.

21

We may, but are not required to, explain how we considered the factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when we articulate how we consider medical opinions and prior administrative medical findings in your case record." *Id.*

When medical opinions or prior administrative findings are "equally persuasive," "well-supported" and "consistent with the record" "about the same issue," "but are not exactly the same, [the ALJ] will articulate how [he or she] considered the other most persuasive factors[] for those medical opinions or prior administrative medical findings in [the claimant's] determination or decision." *Id.* §§ 404.1520c(b)(3), 416.920c(b)(3)

The regulations clarify that the SSA is "not required to articulate how we considered evidence from non-medical sources using the requirements of paragraphs (a) through (c) of this section." *Id.* §§ 404.1520c(d), 416.920c(d). In addition, the regulations expressly state that the SSA will not consider "evidence that is inherently neither valuable nor persuasive" and "will not provide any analysis about how we considered such evidence in our determination or decision, even under § 404.1520c" or 416.920c. *Id.* §§ 404.1520b(c), 416.920b(c). The regulations categorize evidence that is inherently neither valuable nor persuasive as: "[d]ecisions by other governmental and nongovernmental entities;" "[d]isability examiner findings," meaning, "[f]indings made by a State agency disability examiner

22

made at a previous level of adjudication about a medical issue, vocational

issue, or the ultimate issue about whether you are disabled;" and "[s]tatements

on issues reserved to the Commissioner[;]" these statements include:

(i)     Statements that you are or are not disabled, blind, able to work, or able to perform regular or continuing work;

(ii)    Statements about whether or not your impairment(s) meets or medically equals any listing in the Listing of Impairments[];

(iii)   Statements about what your residual functional capacity is using our programmatic terms about the functional exertional levels [] instead of descriptions about your functional abilities and limitations[];

(iv)    Statements about whether or not your residual functional capacity prevents you from doing past relevant work[];

(v)     Statements that you do or do not meet the requirements of a medical-vocational rule[]; and

(vi)    Statements about whether or not your disability continues or ends when we conduct a continuing disability review[.]

*Id.* §§ 404.1520b(c), 416.920b(c).

The regulations also provide that "[b]ecause a decision by any other

governmental and nongovernmental entity about whether you are disabled,

blind, employable, or entitled to any benefits is based on its rules, it is not

binding on us and is not our decision about whether you are disabled or blind

under our rules." *Id.* §§ 404.1504, 416.904.  Therefore, the Commissioner

"will not provide any analysis in our determination or decision about a

decision made by any other governmental or nongovernmental entity about

whether you are disabled, blind, employable, or entitled to benefits." *Id.* The Commissioner will, however, "consider all of the supporting evidence underlying the other governmental or nongovernmental entity's decision that we receive as evidence in your claim[.]" *Id.*

The regulations clarify that "[o]bjective medical evidence means signs, laboratory findings, or both." *Id.* §§ 404.1502(f), 416.902(f). Signs are defined as "one or more anatomical, physiological, or psychological abnormalities that can be observed, apart from your statements (symptoms)." *Id.* Further, "[s]igns must be shown by medically acceptable clinical diagnostic techniques. Psychiatric signs are medically demonstrable phenomena that indicate specific psychological abnormalities, e.g., abnormalities of behavior, mood, thought, memory, orientation, development or perception, and must also be shown by observable facts that can be medically described and evaluated." *Id.* §§ 404.1502(g), 416.902(g). Laboratory findings "means one or more anatomical, physiological, or psychological phenomena that can be shown by the use of medically acceptable laboratory diagnostic techniques[,]" and "diagnostic techniques include chemical tests (such as blood tests), electrophysiological studies (such as electrocardiograms and electroencephalograms), medical imaging (such as x-rays), and psychological tests." *Id.*; §§ 404.1502(c), 416.902(c).

The most recent amendments to the regulations also tweaked the

manner in which the SSA evaluates symptoms, including pain.   "In considering whether you are disabled, we will consider all your symptoms, including pain, and the extent to which your symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence.  We will consider all your statements about your symptoms, such as pain, and any description your medical sources or nonmedical sources may provide about how the symptoms affect your activities of daily living and your ability to work[.]" *Id.* §§ 404.1529(a), 416.929(a).

But the SSA clarified that "however, statements about your pain or other symptoms will not alone establish that you are disabled. There must be objective medical evidence from an acceptable medical source that shows you have a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged and that, when considered with all of the other evidence (including statements about the intensity and persistence about your pain or other symptoms which may reasonably be accepted as consistent with the medical signs and laboratory findings), would lead to a conclusion that you are disabled." *Id.* §§ 404.1529(a), 416.929(a).

Further, "[i]n evaluating the intensity and persistence of your symptoms, including pain, we will consider all of the available evidence, including your medical history, the medical signs and laboratory findings, and statements about how your symptoms affect you." *Id*. The SSA clarified that

25

it will "then determine the extent to which your alleged functional limitations and restrictions due to pain or other symptoms can reasonably be accepted as consistent with the medical signs and laboratory findings and other evidence to decide how your symptoms affect your ability to work." *Id.*

Finally, the SSA notes that "[b]ecause symptoms sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone, we will carefully consider any other information you may submit about your symptoms." *Id.* §§ 404.1529(c)(3), 416.929(c). This other information may include "[t]he information that your medical sources or nonmedical sources provide about your pain or other symptoms (e.g., what may precipitate or aggravate your symptoms, what medications, treatments or other methods you use to alleviate them, and how the symptoms may affect your pattern of daily living)," which "is also an important indicator of the intensity and persistence of your symptoms." *Id.* "Because symptoms, such as pain, are subjective and difficult to quantify, any symptom-related functional limitations and restrictions that your medical sources or nonmedical sources report, which can reasonably be accepted as consistent with the objective medical evidence and other evidence, will be taken into account . . . . We will consider all of the evidence presented, including information about your prior work record, your statements about your symptoms, evidence submitted by your medical sources, and observations by

26

our employees and other persons[.]" *Id.*   The regulations establish that "[f]actors relevant to your symptoms, such as pain, which we will consider include []:

    (i)    [D]aily activities;

    (ii)    The location, duration, frequency, and intensity of . . . pain;

    (iii)    Precipitating and aggravating factors;

    (iv)    The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;

    (v)    Treatment, other than medication, . . . received for relief of . . . pain;

    (vi)    Any measures . . . used to relieve . . . pain.

*Id.*

The new regulations also impose a duty on the claimant: "In order to get benefits, you must follow treatment prescribed by your medical source(s) if this treatment is expected to restore your ability to work." *Id.* §§ 404.1530(a), 416.930(a).   Stated differently, "[i]f you do not follow the prescribed treatment without a good reason, we will not find you disabled or, if you are already receiving benefits, we will stop paying you benefits." *Id.* §§ 404.1530(b), 416.930(a).   Acceptable (or "good") reasons for failure to follow prescribed treatment include:

    (1)    The specific medical treatment is contrary to the established teaching and tenets of your religion;

27

(2)     The prescribed treatment would be cataract surgery for one eye, when there is an impairment of the other eye resulting in a severe loss of vision and is not subject to improvement through treatment;

(3)     Surgery was previously performed with unsuccessful results and the same surgery is again being recommended for the same impairment;

(4)     The treatment because of its magnitude (e.g. open heart surgery), unusual nature (e.g., organ transplant), or other reason is very risky for you; or

(5)     The treatment involves amputation of an extremity, or major part of an extremity.

*Id.* §§ 404.1530(c), 416.930(c).

## G.    Arguments and Analysis[3]

Plaintiff argues that the RFC crafted by the ALJ is neither well explained nor supported by the record.  (ECF No. 16, PageID.3015-24).  The Commissioner argues in response that Plaintiff provides no specific examples of how the RFC failed to reflect his limitations and that substantial evidence supports both the RFC and the ultimate non-disability determination.  (ECF No. 17, PageID.3036-47).

### 1.  The Explanation for the RFC

Plaintiff contends first the ALJ acknowledged the extreme clinical findings but did not explain why the RFC reflects only mild to moderate

---

[3]Plaintiff's arguments relate primarily to the portion of the RFC addressing his psychological limitations.  The Court's analysis is therefore limited to the "mental" RFC composed by the ALJ.

28

physical and mental limitations.  (ECF No. 16 PageID.3015).  In turn, the Commissioner contends that Plaintiff fails to "specify what greater explanation was required of the ALJ" and failed "to meet his burden of showing that greater functional limitations were required." (ECF No. 17, PageID.3037).

### a.  Applicable Law

An RFC describes an individual's residual abilities. *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002); SSR 96-8p, 1996 WL 374184 at *2. (July 2, 1996).  The "RFC is to be an 'assessment of [a claimant's] remaining capacity for work' once [his] limitations have been taken into account" *Howard*, 276 F.3d at 239 (*quoting* 20 C.F.R. § 404.1545). The ALJ must consider the alleged physical, mental, and environmental restrictions in crafting the RFC. 20 C.F.R. § 404.1545(b-d).  Mental restrictions include limitations in "understanding, remembering, and carrying out instructions and in responding appropriately to supervision, co-workers, and work pressures in a work setting." § 404.1545(c). "Although a function-by-function analysis is desirable, SSR 96–8p does not require ALJs to produce such a detailed statement in writing." *Delgado v. Commissioner of Social Sec.*, 30 Fed.Appx. 542, 547–548, 2002 WL 343402, at *5 (6th Cir. 2002) (internal citations omitted). "[T]he ALJ need only articulate how the evidence

in the record supports the RFC determination, discuss the claimant's ability to perform sustained work-related activities, and explain the resolution of any inconsistencies in the record." *Id.*

### b. The ALJ's Mental RFC

The RFC regarding the psychological limitation reads as follows:

> The claimant could perform simple tasks, as well as make simple work-related decisions. He could not work at a production rate pace, such as assembly line work. He could adapt to occasional changes in his work routine or job tasks. He could occasionally interact with supervisors and coworkers but not with the public.

(*Id.* at PageID.47).

### c. The Rationale

The ALJ provided a one-paragraph summation of the records pertaining to Plaintiff's psychological condition, noting that Plaintiff "occasionally lost track during a conversation but was able to focus when redirected"; "exhibited paranoia;" "exhibited delayed processing time"; was "often anxious and agitated"; and exhibited "poor" impulse control at times. (*Id.* at PageID.50). On the other hand, he noted that Plaintiff had fluent speech and a "linear and well organized" thought process; good long-term memory; and denied suicidal or homicidal ideation. (*Id.*)

As to the opinion evidence, the ALJ concluded that the findings by non-examining sources Ronald Marshall, Ph.D. and Dr. Douglass, Ph.D. were "generally persuasive." (*Id.* at PageID.51). The ALJ noted that these non-

examining sources "supported their assessments with a detailed analysis of the evidence of record" and were "generally consistent with the claimant's mental status examination findings, which show anxious mood, flat affect, full orientation, logical thought process, some paranoia, no hallucinations or delusions, some distractibility, short-term memory loss, no suicidal ideation, poor impulse control, and good judgment and insight."   The ALJ acknowledged the third-party function report by Plaintiff's wife describing disabling physical and psychological limitation but stated that he was not required to evaluate such evidence using the medical opinion evaluation factors set forth in 20 C.F.R. § 404.1520b.   (*Id*.) citing (ECF No. 10-6, PageID.453).

### d.  The ALJ Did Not Supply an Adequate Explanation for the Mental RFC

To be sure, the ALJ provided a superficial rationale for finding no more than moderate psychological limitation by adopting the findings of the non-examining sources.  Further, under § 404.1520c(a), the fact that Drs. Douglass and Marshall were one-time non-examining sources rather than long-term treating sources does not prevent the ALJ from finding their assessments persuasive.  However, the ALJ failed to acknowledge that Dr. Marshall's assessment was tempered by his comment that Plaintiff's "true functional limitations" for the period under review were "not entirely clear."  (ECF No.

10-3, PageID.263).

And even assuming Dr. Douglass' findings of only moderate limitation were enough to support the non-disability determination, the ALJ's professed reliance on the non-examining sources is problematic for several additional reasons.  First, the administrative opinion contains absolutely no mention of treating psychologist Dr. LaDou's September 21, 2021 opinion letter stating that Plaintiff required "extensive" caregiving 24 hours a day; required "assistance with bathing," "preparing and reminders for meals," transportation, and dressing.  (ECF No. 10-9, PageID.2949).   Dr. LaDou's opinion letter also states that Plaintiff was "suspicious, paranoid, and distrustful of others resulting in anger outbursts when in any small gathering, crowded situation, or when riding in the car." (*Id*.) He noted further that due changes in oxygen saturation and medication, Plaintiff experienced "profound sleepiness." (*Id*.) He opined that Plaintiff was unable to live alone.  (*Id*.) Under § 404.1520c(b)(2), the ALJ was required discuss whether Dr. LaDou's opinion was supported and consistent with the record.  The ALJ's failure to discuss the supportability and consistency of Dr. LaDou's opinion (much less his failure to even acknowledge the opinion) constitutes reversible error.

The Commissioner attempts to excuse this oversight by arguing that Plaintiff has failed to show that Dr. LaDou's September 2021 opinion "relates back" to the relevant period preceding the December 31, 2019 expiration of

benefits.  (ECF No. 17, PageID.3042) (citing *Ballard v. Comm'r of Soc. Sec.*,
No. 13-CV-14662,2014 WL 6686771, at *13 (E.D. Mich. Nov. 26, 2014))
("Post-insured period records are generally not relevant unless they establish
that an impairment existed continuously and in the same degree from the date
the insured status expired") (internal citations omitted).

The Commissioner's argument is not well taken.   Dr. LaDou's opinion
letter, coupled with the evidence for the relevant period, cannot be interpreted
to state that the described limitations either began or reached disability-level
severity after the expiration of benefits.  Indeed, Dr. LaDou's medical records
for the relevant period comport with his opinion letter: "severe depression and
anxiety" characterized by "paranoid ideation," agitation in social situations,
and the inability to live independently.  Dr. LaDou's records for the relevant
period state that Plaintiff turned on the gas stove while sleepwalking, was
unable handle the family's finances, spent impulsively, and created a safety
hazard while mixing cleaning products after believing that he needed to
"disinfect" the house from some imagined contamination.  (ECF No. 10-7,
PageID.840).   The records also state that Plaintiff exhibited short-term
memory deficiencies including the inability to follow a conversation.  (ECF
No. 10-7, PageID.797, 799, 803-04, 807-08, 852, 860-61, 900, 934), (ECF
No. 10-8, PageID.1408, 1461, 1601, 1608-09, 1699, 1778-79).   Additional
records from the same period note that Plaintiff exhibited manic symptoms

and was difficult to redirect.  (*Id*. at PageID.1606).  Given that Dr. LaDou's

September 2021 opinion letter set forth the degree of impairment reflected by

treating records for the relevant period, the ALJ's failure to acknowledge the

treating opinion constitutes reversible error.  *Bell v. Comm'r of Soc. Sec.*, No.

1:22-CV-723, 2022 WL 18156676, at *10 (N.D. Ohio Nov. 29, 2022), *report

and recommendation adopted,* No. 1:22-CV-723, 2023 WL 130837 (N.D.

Ohio Jan. 9, 2023) (Failure to discuss the portion of the doctor's opinion

stating that nausea and vomiting would cause "excessive absenteeism"

constituted reversible error).  Here, the ALJ's failure to address Dr. LaDou's

opinion altogether even more strongly supports the case for remand.

Aside from the fact the ALJ overlooked Dr. LaDou's opinion, the ALJ's

rationale for endorsing the two non-examining sources falls short of the

requirement under 20 C.F.R. § 404.1520c(a) to articulate the factors of

supportability and consistency with the entire record.  The ALJ stated that the

assessments by Drs. Douglass and Marshall were "supported . . . with a

detailed analysis of the evidence of record." (ECF No. 10-2, PageID.51).

However, neither the ALJ's endorsement of these sources nor his one-

paragraph summary of the records pertaining to Plaintiff's mental health

treatment is accompanied by a citation to the record except to say that the

evidence relied upon was contained somewhere in exhibits B1F through B6F.

(*Id*. at PageID.50).  Under some circumstances, the failure to include pinpoint

cites could be excusable and even permissible.  See *Ross v. Comm'r of Soc. Sec.*, No. 2:15-CV-13133, 2017 WL 693375, at *10 (E.D. Mich. Feb. 2, 2017), *report and recommendation adopted,* No. 2:15-CV-13133, 2017 WL 679353 (E.D. Mich. Feb. 21, 2017) (ALJ's failure to include pinpoint cites "<u>is an inconvenience</u>, not grounds for relief.") (underscore in original).

In contrast here, the present transcript is 2,956 pages long and exhibits B1F to B6F, standing alone, consist of 2,499 pages.  My own review of the records contained in these exhibits, as discussed above, include evidence supporting a disability determination.[4]  Without more than a generalized citation to the voluminous record, the Court is unable to ascertain which records the ALJ relied upon in coming to the opposite conclusion.  "Citations to everything are citations to nothing."  *Allen v. Benton*, No. 18-CV-4047, 2022 WL 18147674, at *3 (N.D. Ill. Feb. 25, 2022).  It is not the Court's job to rummage through the transcript to find support for the administrative findings.

Despite the fairly relaxed articulation standard set forth in *Delgado* for

---

[4] While the Commissioner faults Plaintiff for failing to specify *how* the ALJ ought to have changed the mental RFC, the records for the relevant period cited by Plaintiff describe activity blatantly inconsistent with full-time work.  To give one example, the medical records state that he required periodic redirection.  The VE testified that the need for redirection every hour would render the hypothetical individual disabled.  (ECF No. 10-2, PageID.80).  The VE also testified that the need to be off task for more than 10 percent of the workday would preclude competitive employment.  (*Id*. at PageID.79).

supporting an RFC, an ALJ "must articulate ... his analysis of the evidence to allow the appellate court to trace the path of his reasoning." *Lowery v. Commissioner, Social Sec. Administration,* 55 F. App'x 333, 339 (6th Cir. 2003). "To be entitled to substantial deference ... agency rulings must clearly articulate the rationale underlying the decision." *Bailey v. Commissioner of Social Sec.,* 173 F.3d 428, 1999 WL 96920, *3–4 (6th Cir. February 2, 1999) (citing *Hurst v. Secretary of Health & Human Servs.,* 753 F.2d 517, 519 (6th Cir.1985)). The ALJ must "build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011). To merely say that the support for the non-disability finding is contained somewhere within 2499 pages of evidence does not provide an adequate "path" for judicial review of the ALJ's determination.

The administrative opinion contains additional, related deficiencies. The ALJ not only neglected to acknowledge Dr. LaDou's opinion letter but also failed to identify him by name or acknowledge his long-term treatment during the relevant period. While the ALJ acknowledged and discussed the third-party report by Plaintiff's wife, he failed to acknowledge that she was not only a relative, but also a licensed practical nurse hired by the VA to care for Plaintiff. (ECF No. 10-2, PageID.51), (ECF No. 10-7, PageID.799) (ECF No. 10-8, PageID.1608-09).

Finally, the Commissioner admits that the ALJ erroneously concluded

36

that in the absence of "new and material evidence" or a change in the law, he was bound by the March 2018 findings by another ALJ. (ECF No. 17, PageID.3033-34) citing (ECF No. 10-2, PageID.41-42). The Commissioner argues that although the ALJ applied the incorrect standard for reviewing the material from the relevant period, the error is harmless because the ALJ reviewed the newer evidence. (*Id.*).

In *Earley v. Comm'r of Soc. Sec.*, 893 F.3d 929, 931 (6th Cir. 2018), the ALJ believed that he was precluded from revisiting an earlier finding that the claimant was not disabled. "But this belief was incorrect. Rather, the Sixth Circuit explained, '[a]n individual may file a second application—for a new period of time—for all manner of reasons and obtain independent review of it so long as the claimant presents evidence of a change in condition or satisfies a new regulatory condition.'" *Balknight v. Comm'r of Soc. Sec.*, No. 18-11843, 2019 WL 4011881, at *13 (E.D. Mich. July 31, 2019), *report and recommendation adopted,* No. 18-CV-11843, 2019 WL 3997146 (E.D. Mich. Aug. 23, 2019) (citing *Earley* at 932). "As such, *res judicata* does not 'prevent the agency from giving a fresh look to a new application containing new evidence or satisfying a new regulatory threshold that covers a new period of alleged disability while being mindful of past rulings and the record in prior proceedings.'" *Id.* (citing *Earley* at 931).

Here, the ALJ noted a change in the law pertaining to his Step Three

37

findings and "new and material medical evidence" of additional severe impairments at Step Two. (ECF No. 10-2, PageID.41). But he nonetheless concluded that "there is no significant difference in the [RFCs] in the prior decision and the current one," which suggests that he applied the older standard in determining the RFC. (*Id*.)

As discussed above, the Court is not confident that the ALJ gave the medical records from June 2018 forward a "fresh look." Besides a blanket reference to 2,499 pages of evidence, the ALJ did not cite the newer treating records in discussing Plaintiff's psychological condition. He ignored a newer treating opinion describing disability-level psychological limitation. He failed to acknowledge that Plaintiff's wife had been hired as a full-time caregiver. Where courts have cited the wrong standard but have nonetheless given the new evidence a fresh look, the ALJ's decision satisfies *Earley*; but "if not, then remand is appropriate." *Balknight,* at \*14; *Snyder v. Comm'r of Soc. Sec.*, No. 1:17-cv-486, 2018 WL 4658813, at \*3 (W.D. Mich. 2018) (finding that the ALJ's decision satisfied *Earley* by "effectively re-open[ing]" the prior ALJ's decision); *but see Dunn v. Comm'r of Soc. Sec.*, No. 1:17-cv-634, 2018 WL 4574831, at \*3 (W.D. Mich. 2018) (reversing where the ALJ did not satisfactorily review the evidence, but rather focused on the prior RFC findings); *Cassaday v. Comm'r of Soc. Sec.*, No. 1:17-cv-630, 2018 WL 4519989, at \*3 (W.D. Mich. 2018) (reversing where the ALJ's

decision was not consistent with *Earley*'s requirement of independent review).

Given the additional errors discussed above, the failure to apply the standard set forth in *Earley* provides independent grounds for remand.

### 2.  Substantial Evidence

Plaintiff argues that the RFC is not only inadequately explained but also is not supported by substantial evidence.  (ECF No. 16, PageID.3018).  He cites several portions of the record supporting a disability finding that were not addressed by the ALJ. (*Id*. at PageID.2018-22).   The Commissioner responds that the ALJ adequately "considered [Plaintiff's] paranoid ideation and accounted for it in his mental RFC finding." (ECF No. 17, PageID.3042). The Commissioner argues that the administrative opinion was otherwise well-supported and that Plaintiff is impermissibly asking the Court to "reweigh the evidence and reach a new finding." (*Id*.) (citing *Mullins v. Sec'y of Health & Human Servs.*, 680 F.2d 472, 472 (6th Cir.1982)).

It without dispute that the administrative opinion contains several articulation errors. The ALJ did not address Dr. LaDou's opinion, he supported the mental RFC a with one blanket citation to almost 2,500 pages of medical evidence, he applied the wrong standard in reviewing the evidence created for the relevant period, and he failed to acknowledge that Plaintiff's wife was not only a family member, but had been hired by the VA to assist

Plaintiff in taking his medication, bathing, dressing, handling his finances, and transportation. The records for the relevant period include evidence of significant psychological limitation inconsistent with competitive employment. While the ALJ correctly noted that under 20 C.F.R. § 1504, he was not bound by VA's determinations of partial or complete disability, he was most certainly required to "consider all of the supporting evidence underlying" those determinations. (ECF No. 10-2, PageID.51) (citing § 1504). *See Gonzales v. Kijakazi*, No. 121CV00129JLTHBK, 2022 WL 4484098, at *5 (E.D. Cal. Sept. 27, 2022), *report and recommendation adopted sub nom. Gonzales v. Comm'r of Soc. Sec.*, No. 121CV00129JLTHBK, 2022 WL 7688310 (E.D. Cal. Oct. 13, 2022); *Betancourt-Algarin v. Kijakazi*, No. 20CV09327GBDBCM, 2022 WL 5176862, at *10 (S.D.N.Y. Aug. 5, 2022), *report and recommendation adopted,* No. 20CIV9327GBDBCM, 2022 WL 3867851 (S.D.N.Y. Aug. 30, 2022); *Haynes v. Kijakazi*, No. CIV-21-217-AMG, 2022 WL 1721060, at *3, n. 3 (W.D. Okla. May 27, 2022). It is unclear whether the evidence underlying the VA's determination has been adequately reviewed.

But the Commissioner is correct that it is not the Court's job to reweigh the evidence. Until the above-discussed errors are remedied, the determination of whether substantial evidence would support a non-disablilty finding is premature. For the same reasons, I recommend that this case be

remanded for further fact-finding rather than an award of benefits. A remand for benefits is appropriate only where "all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits." *Faucher v. Secretary of Health and Human Services,* 17 F.3d 171, 176 (6th Cir. 1994).

## H. Conclusion

For these reasons, I recommend that the Court **GRANT** Plaintiff's motion for summary judgment (ECF No. 16), that the case be remanded under sentence four of Section 405(g) and that the Commissioner's motion (ECF No. 17) be **DENIED**.

## III. REVIEW

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties

are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date: February 13, 2023

s/PATRICIA T. MORRIS
Patricia T. Morris
United States Magistrate Judge